UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS
EASTERN DIVISION

| | |
|---|---|
| DIRECTV, INC., a California corporation,<br><br>      Plaintiff,<br><br>    v.<br><br>CRAIG PATRICK,<br><br>      Defendant. | No. 03-12292-MLW<br><br>**DIRECTV'S AND ITS COUNSEL'S REPSONSE TO THE COURT'S ORDER TO SHOW CAUSE REGARDING POSSIBLE FED. R. CIV. P 11 VIOLATIONS** |

Counsel for plaintiff, DIRECTV, Inc. ("DIRECTV"), now comes before the Court, pursuant to the Court's Memorandum and Order, dated September 17, 2004, to show why he and DIRECTV have not violated Fed. R. Civ. P. 11(b) in this action.

## I. INTRODUCTION

DIRECTV, and its counsel, conducted a reasonable pre-filing investigation concerning the claims alleged against defendant Craig Patrick in DIRECTV's Complaint for Compensatory, Statutory and Other Damages, and for Injunctive Relief. That investigation revealed the following evidence and information:

- Purchase and shipping records indicating that defendant Patrick purchased a device known as an "Atomic Multi-Purpose" from a website devoted to satellite television piracy, and that the device was shipped to the defendant's address in Holliston, Massachusetts.

- Expert analysis indicating that the "Atomic Multi-Purpose" device was designed and manufactured to perform three functions – known in the satellite signal pirate community as "unlooping," "loading," and "programming" – and that the primary purpose of the "Atomic Multi-Purpose" device was the pirating of DIRECTV's satellite television signal.

- Expert analysis that the both the "unlooping" and "loading" functions of the "Atomic Multi-Purpose" device utilize "glitching" technology which is used solely in products primarily designed for the purpose of pirating DIRECTV's signal.

- Expert analysis indicating that the "Atomic Multi-Purpose" device could be used to alter potentially hundreds of DIRECTV Access Cards in order to pirate or steal DIRECTV's satellite signal and television programming.

- The existence of a market, at the time of the defendant's purchase, for DIRECTV Access Cards that had been modified with "glitching" technology, as well a service market for individuals who could "repair" previously modified and disabled Access Cards using "glitching" technology.

- Expert analysis indicating that eighty percent (80%) of the chips, which comprise the "Atomic Multi-Purpose" device, are devoted to the "glitching" technology utilized by the "unlooping" and "loading" functions of the "Atomic Multi-Purpose" device.

- Expert analysis indicating that the primary purpose of the "programming" function of the "Atomic Multi-Purpose" device is also to circumvent DIRECTV's security measures, unlawfully intercept its satellite signal, and pirate DIRECTV's television programming.

- DIRECTV account history records for defendant Patrick indicating that he possessed all of the necessary satellite hardware (satellite dish, integrated receiver decoder, and access card), that when used in conjunction with an "Atomic Multipurpose" device, would enable the defendant to illegally decrypt or steal DIRECTV's satellite signal.

- DIRECTV account history records for defendant Patrick, which contain indicators consistent with satellite signal piracy and DIRECTV's allegations concerning interception and decryption of its signal.

All of this evidence, both direct and circumstantial, which was acquired after a thorough and on-going investigation, establishes a reasonable basis for DIRECTV's claims in the original complaint, including its allegations of modification of devices for purposes of

DIRECTV's AND ITS COUNSEL'S REPSONSE
TO THE COURT'S ORDER TO SHOW CAUSE
REGARDING POSSIBLE FED. R. CIV. P 11
VIOLATIONS
NO. 03-12292-MLW – Page 2

piracy (Count IV), and distribution (Count III). Therefore, neither DIRECTV, nor its counsel, violated Rule 11 in the filing of the original complaint.

Nevertheless, in an abundance of caution, DIRECTV and its counsel took certain prophylactic corrective actions upon receipt of the Court's September 17, 2004 Order. In respectful deference to the concerns raised by the Court, DIRECTV and its counsel filed an Amended Complaint eliminating the allegations of distribution, as well as the claims contained in Count III (for distribution under 47 U.S.C. § 605(e)(4)) and Count IV (for modification of devices under 47 U.S.C. § 605(e)(4)). In further deference to the Court's concerns regarding the minimum amount of statutory damages under 47 U.S.C. § 605(e)(4), DIRECTV's Amended Complaint allows the Court significantly more discretion than its original complaint when assessing damages upon a motion for default judgment. *See* Amended Complaint, Prayer for Relief, at 10, ¶ 2 (seeking damages for violation of 47 U.S.C. § 605(a) "of *up to* $10,000")(emphasis added). Thus, DIRECTV, and its counsel, respectfully request that the Court enter an order declining to impose any sanctions, and finding that neither DIRECTV, nor its counsel, violated Rule 11 in this action.

## II.    INVESTIGATION

On November 29, 2001, in the matter of DIRECTV, Inc. v. Derek Trone, et al., No. SA CV-01-370-DOC (Anx)(United States District Court, Central District California), with the assistance of the United States Marshal Service, DIRECTV executed Writs of Seizure that had been issued by the United States District Court for the Central District of California, at a residence in Westfield, Indiana. *See* Declaration of James Whalen, dated October 20, 2004 ("Whalen Decl.") at ¶ 2. During and subsequent to this raid, DIRECTV came into possession of a substantial body of sales records, shipping records, email

communications, credit card receipts and other records related to a company called Smart Card Solutions, d/b/a DSS-Pro. *Id.*  DIRECTV's investigations revealed that DSS-Pro was a large volume source of pirate technologies. *Id.*

A portion of the records obtained as a result of and subsequent to this raid indicated that, on or about June 23, 2001, defendant Patrick purchased a pirate access device called an "Atomic Multi-Purpose" from DSS-Pro, and that the device was shipped to defendant Patrick's address in Holliston, Massachusetts. *See id.* at ¶ 2 at Ex. A; *see also* Declaration of Spencer Freeman, dated October 20, 2004 ("Freeman Decl.") at ¶ 1, Ex. B.[1]

Upon learning of defendant Patrick's purchase, DIRECTV and it's counsel further investigated the facts. *See* Declaration of John M. McLaughlin, dated October 20, 2001 ("McLaughlin Decl.") at ¶¶ 5-7; *see generally* Whalen Decl. & Declaration of Michael Barr, dated October 20, 2004 ("Barr Decl."). DIRECTV and its counsel were aware of DIRECTV's expert's opinion regarding the device purchased by the defendant. *See* McLaughlin Decl. at ¶¶ 7-8. DIRECTV's expert report concerning this device, which is dated October 31, 2003, more than two weeks prior to the filing of the original complaint in this matter, confirmed that the "Atomic Multi-Purpose" device performed three basic functions, known in the pirate community as "unlooping," "loading," and "programming," and that the primary purpose of the device was to assist in the piracy of DIRECTV's programming. *See* Barr Decl. at ¶¶ 4-6, 35 & Ex. A, Schedule 2.

A DIRECTV system consists of a DIRECTV-compatible satellite dish, a DIRECTV receiver (also known as an "integrated receiver/decoder," or "IRD"), and a DIRECTV

---

[1] The purchase records for the defendant refer to the device in question as both an "Atomic PUT" and an "Atomic Multi-Purpose." *See* Whalen Decl. at ¶ 2, Ex. A. These are simply two different names for the

Access Card. *Id.* at ¶ 7. Together, these components convert DIRECTV's encrypted (or scrambled) satellite signal broadcasts to viewable programming that can be displayed on the attached television. *Id.*

An IRD is placed near the television that receives DIRECTV's encrypted signals from the satellite dish. *Id.* at ¶ 8. The IRD processes and decrypts (unscrambles) incoming signals with assistance from an authorized DIRECTV Access Card that is inserted into it. *Id.* When there is no DIRECTV Access Card inserted into the IRD or the inserted card is unauthorized, none of the encrypted (or scrambled) programming is viewable on the television. *Id.* at ¶ 9. When an authorized Access Card is inserted into the IRD, only those channels to which the customer has subscribed or purchased will be decrypted and made viewable on the customer's television. *Id.*

DIRECTV Access Cards are smartcards. *Id.* at ¶ 10. They are similar in shape and size to credit cards, but they contain an embedded computer and memory. DIRECTV's Access Cards contain DIRECTV-specific hardware and software that is designed to (1) provide authorization to decrypt DIRECTV satellite broadcasts for customers who have subscribed to those services and (2) record pay-per-view purchase records for later communication to DIRECTV for billing purposes. *Id.*

All known methods of receiving DIRECTV's signal without authorization from DIRECTV, otherwise referred to as piracy of DIRECTV's signal, rely upon modifying DIRECTV's Access Card or its behavior in ways not authorized by DIRECTV. *Id.* at ¶ 11. Although DIRECTV uses various security methods to prevent piracy, there are numerous

---

identical device. *See id; see also* Declaration of Michael Barr, dated October 20, 2004 ("Barr Decl.") at ¶ 4. For ease of reference, the term "Atomic Multi-Purpose" will be used throughout this memorandum.

devices for sale to thwart these measures, one of which is the "Atomic Multi-Purpose" device at issue here. *Id.*

From time to time, as part of its on-going efforts to combat piracy, DIRECTV has introduced new generations of Access Cards and disabled older Access Cards. The five generations of Access Cards issued to date are known as P1 (or F), P2 (or H), P3 (or HU), P4, and D1 cards. *Id.* at ¶ 12. In addition, DIRECTV also periodically developed and administered electronic countermeasures, which are commonly referred to as "ECMs." *Id.* at ¶ 15. An ECM involves sending a steam of data that detects and targets illegally modified DIRECTV Access Cards and disables them. *Id.*

According to DIRECTV's expert analysis, both the "unlooper" and the "loader" functions contained with the "Atomic Multi-Purpose" device utilize "glitching" technology to circumvent the security features of P2 and P3 Access Cards. *Id.* at ¶ 20. Further, expert analysis revealed that 80% of the chips of the "Atomic Multi-Purpose" device were included solely for the purpose of "glitching." *Id.* at ¶ 22. Based on the expert analysis, DIRECTV's counsel understood that the "Atomic Multi-Purpose" "loader" used "glitching" technology to modify DIRECTV's P3/HU Access Cards in order to disable or circumvent DIRECTV's security measures and pirate DIRECTV's signal. *Id.* at ¶¶ 19-20. In addition, expert analysis revealed that the "Atomic Multi-Purpose" "unlooper" also used "glitching" technology to alter certain generations of DIRECTV Access Cards in order to circumvent the effects of DIRECTV's ECMs. *Id.* at ¶¶ 15-18. In other words, "glitching" can be used to restore functionality to illegally modified P2/H and P3/HU Access Cards that have been

previously disabled by an ECM.[2]  *Id.*  Based on the expert analysis, counsel for DIRECTV understood that there is no legitimate use for the "loading" and "unlooping" functions of the "Atomic Multi-Purpose" that use "glitching" technology.  *See id.* at ¶ 21.

Expert analysis also revealed that, in addition to "unlooping" and "loading," the two remaining electrical parts of the "Atomic Multi-Purpose" comprised a device which is known as a "programmer" in the pirate community.   *See* Barr Decl. at ¶ 14, & Ex. A, Schedule 2 at 14-15.  According to DIRECTV's expert analysis, the "programmer" function was included in the device as a convenience to DIRECTV signal pirates, who also use "programmers" to circumvent DIRECTV's security measures in order to pirate DIRECTV satellite television.[3]  *Id.*  Expert analysis of the device concluded that, although it is "theoretically" possible to use the "programmer" contained in the "Atomic-Multi-Purpose" device for a limited set of legitimate uses, such an approach makes no sense from an engineering perspective in the PC environment, and that the "programming" portion of the "Atomic-Multi-Purpose" device was **not** designed for such legitimate purposes.  *See id.* at ¶¶ 24-33.  Nor did the theoretical possibility of such legitimate use alter the expert's opinion that the "programmer" contained in the "Atomic Multi-Purpose" device was primarily designed to assist in the piracy of DIRECTV's satellite television signals.  *Id.* at ¶

---

[2] Historically, the DIRECTV pirate community refers to that portion of the "glitching" circuitry contained in an "Atomic Multi-Purpose" device that can modifiy certain generations of DIRECTV Access Cards to enable piracy of DIRECTV's signal as a "loader."  Whereas that portion of the "glitching" circuitry that can return functionality to certain DIRECTV Access Cards that have been disabled by DIRECTV ECMs as an "unlooper."  *See* Barr Decl. at ¶ 2, Ex. A, Schedule 2 at 14-15, n.2.  Electronically speaking, however, there is no difference between an "unlooper" and a "loader" – they both utilize a "glitching technology on certain generations of DIRECTV Access Cards.  *See id.*

[3] The expert report also notes that presence of the "glitching" hardware on the "Atomic Multi-Purpose" device adds significantly to the cost of manufacturing, and thus, to owning the device.  Given that stand-alone "programmers" are sold, often on the very same pirate websites, for about 1/3 the price of the device

33.  Based on this comprehensive expert analysis, counsel for DIRECTV understood that the primary purpose of the "Atomic Multi-Purpose" device was to assist in the piracy of DIRECTV's satellite television programming.

Significantly, counsel for DIRECTV also understood that the "Atomic Multi-Purpose" device was not designed for a one-time or single use.  Rather, based on expert analysis, DIRECTV understood that all three functions of the "Atomic Multi-Purpose" could be used modify one, two or even hundreds of DIRECTV Access Cards.  *Id.* at ¶¶ 23, 35.  Further, each such modified card could then in turn be used to unlawfully decrypt DIRECTV programming.  *Id.* at ¶ 23.  Because the defendant would need only one functioning illegally modified access card in order to decrypt DIRECTV's satellite signal for his own personal use, *see id.,* counsel for DIRECTV drew the permissible evidentiary inference that any additional illegally modified access cards that were returned to functionality by the defendant's "Atomic Multipurpose" device would be distributed to others.

Based on its experience and long history combating satellite piracy, DIRECTV and its counsel were also aware that, at the time of the defendant's purchase, a market existed for the sale and distribution of P2/H and P3/HU Access Cards that had been "glitched," or modified by devices like the "Atomic Multi-Purpose," for the purpose of enabling the purchasers of these modified Access Cards to pirate DIRECTV's programming.  *See* Whalen Decl. at ¶ 3.  In addition, DIRECTV and its counsel were aware that a service market existed for individuals who owned "glitching" devices like the "Atomic Multi-Purpose" device to "repair" certain generations of DIRECTV Access Cards that had been

purchased by the defendant, it is extremely unlikely that someone would buy an "Atomic Multi-Purpose" for

disabled by one of DIRECTV's ECMs. *Id.* at ¶ 4. Once a disabled Access Card had been "repaired" by someone possessing a device capable of "glitching," the owners of the "repaired" card would be able to resume pirating DIRECTV's signal. *Id.*

In addition to the expert analysis, DIRECTV also provided counsel with a copy of records related to the defendant's DIRECTV account history. Defendant Patrick's DIRECTV account history, in conjunction with his purchase of a known pirate device, contained activity consistent with piracy. *See* Whalen Decl. at ¶¶ 5-10, Ex. B. First, DIRECTV's records indicated that the defendant obtained a DIRECTV account in 1998, at the same address where the "Atomic Multi-Purpose" device was delivered in Holliston, Massachusetts. *Id.* at ¶ 6, Ex. B. Thus, the defendant plainly possessed the necessary hardware (an access card, satellite dish, and integrated receiver decoder) to receive DIRECTV's satellite signal. *Id.* at ¶¶ 7-8. When this equipment was used in combination with the "Atomic Multi-Purpose" device, defendant would be able to both receive and illegally decrypt DIRECTV's signal. *Id.* at ¶¶ 7-8.

More to the point, the defendant's account history is incriminating. Between December 3, 2000 and March 3, 2003, the defendant failed to pay for his DIRECTV service and allowed his account to go into "write off." *See* Whalen Decl. at ¶ 9. Approximately six months after letting his account go into arrears, defendant Patrick purchased his "Atomic Multi-Purpose" device. *Id.* The purchase of such a device is clear indication of a customer's intention to continue access to DIRECTV's programming, albeit without payment to or authorization from DIRECTV. *Id.* Indeed, DIRECTV has discovered similar activity in the account records of numerous other signal pirates. *Id.* Thus, the

---

the "programmer" function alone by mistake. Barr Decl. at ¶ 34.

DIRECTV's AND ITS COUNSEL'S REPSONSE
TO THE COURT'S ORDER TO SHOW CAUSE
REGARDING POSSIBLE FED. R. CIV. P 11
VIOLATIONS
NO. 03-12292-MLW – Page 9

defendant had all the necessary equipment to intercept and illegally decrypt DIRECTV's satellite signal during the same period of time that he was failing to pay DIRECTV for service to which he had subscribed. *Id.* at ¶ 10.  Consistent with DIRECTV's allegation of interception, the obvious, logical, and permissible inference to be drawn from this damaging circumstantial evidence, is that the defendant was using the "Atomic Multi-Purpose" device for the purpose for which it was designed – the unlawful interception and decryption of DIRECTV's satellite signal for which he had failed to pay. *See id.* at ¶¶ 9-10.

Thus, DIRECTV and its counsel had obtained and reviewed a substantial body of evidence against the defendant, both direct and circumstantial, which provided a reasonable basis for all of the allegations in its original complaint.

### III.  ARGUMENT AND AUTHORITY

### A.  STANDARDS FOR APPLYING, SUA SPONTE, RULE 11 SANCTIONS.

Courts must exercise extreme caution in sanctioning attorneys under Fed. R. Civ. P. 11. *Larez v. Holcomb,* 16 F.3d 1513, 1522 (9th Cir. 1994).  They "must avoid chilling an attorney's enthusiasm and creativity," *E.E.O.C. v. Tandem Computers Inc.,* 158 F.R.D. 224, 227 (D. Mass. 1994)(citing *Cruz v. Savage*, 896 F.2d 626, 631 (1st Cir. 1990).

In pertinent part, Rule 11 provides that when signing a pleading, motion or other paper presented to the Court, the attorney certifies that:

> (b) to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances, --
> *******
> (2) the claims, defenses, and other legal contentions therein are warranted by existing law or by a nonfrivilous argument for the extension, modification, or reversal of existing law or the establishment of new law, [and]
> (3) the allegations and other factual contentions have evidentiary support or, if specifically so identified, are likely

> to have evidentiary support after a reasonable opportunity for
> further investigation of discovery....

Fed. R. Civ. P. 11. [4]

Yet, special considerations apply when a potential Rule 11 violation is raised *sua*

*sponte* by the Court. When a request for sanctions is initiated by an opposing party's

motion, the "safe harbor" provision in Rule 11(c)(1)(A) provides the non-moving party

with a twenty-one (21) day opportunity to withdraw or appropriately correct the challenged

paper or allegation. *See* Fed. R. Civ. P. 11(c)(1)(A). However, where the Court raises the

issue *sua sponte*, there is no *per se* "safe harbor" provision in the Rule. *Compare* Fed. R.

Civ. P. 11(c)(1)(A) *with* 11(c)(1)(B). Thus, courts, including the Bankruptcy Court for the

District of Massachusetts, have ruled that *sua sponte* Rule 11 sanctions "should be imposed

only when they are analogous to a 'contempt of court.'" *In re Melendez,* 235 B.R. 173, 202

(Bankr. D. Mass. 1999)(citing Advisory Committee Note to Fed. R. Civ. P. 11 (show cause

orders will ordinarily be issued only in situations that are akin to a contempt of court)(1993

Amendments)). *See also Kaplan v. Daimlerchrysler,* 331 F.3d 1251, 1255-56 (11th Cir.

2003); *Barber v. Miller,* 146 F.3d 707, 711 (9th Cir. 1998); *Wesley v. Churchill Dev. Corp.,*

99 F.3d 1141 (6th Cir. 1996); *Hadges v. Yonkers Racing Corp.,* 48 F.3d 1320, 1329 (2d Cir.

1995).

The Court should find that neither DIRECTV, nor its counsel, violated Rule 11.

After all, DIRECTV and its counsel are not required to prove their claims at pleading, but

merely to demonstrate their belief, formed after a reasonable inquiry under the

---

[4] When a complaint is in question, courts do not engage in the "improper purpose" analysis contemplated by Fed. R. Civ. P. 11(b)(1), because a non-frivilous complaint cannot, as a matter of simple logic, be filed for an improper purpose. *See Golden Eagle Distributin Corp. v. Burrows Corp.,* 801 F.2d1531, 1536 (9th Cir. 1986).

circumstances, that the claims contained in the original complaint are warranted by existing

law or a non-frivolous extension thereof, and have, or are likely to have following an

opportunity for discovery, adequate evidentiary support. *See* Fed. R. Civ. P. 11; *see also*

Advisory Committee Note to Fed. R. Civ. P. 11 ("The certification is that there is (or likely

will be) "evidentiary support" for the allegation, not that the party will prevail with respect

to its contention regarding the fact."). Certainly, under the heightened standards required

for *sua sponte* Rule 11 sanctions, the facts concerning DIRECTV's pre-filing investigation,

and subsequent prophylactic amendment of the complaint in deference to the Court's

concerns, do not warrant a finding that either DIRECTV or its counsel committed violations

akin to contempt. Indeed, as required under Rule 11 and demonstrated below, the pre-filing

inquiry of DIRECTV and its counsel, was "reasonable under the circumstances." Fed. R.

Civ. P. 11(b).

## B. DIRECTV'S COMPLAINT IS WELL-GROUNDED BOTH IN LAW AND IN FACT.

In its September 17, 2004 Order, the Court raised questions concerning three

substantive areas of DIRECTV's original complaint: 1) the functionality of the "Atomic

Mutli-Purpose" device and whether it could be utilized for legitimate uses or is designed

"*primarily* of assistance in the unauthorized decryption of...direct-to-home satellite

services" as required for DIRECTV's claims under 47 U.S.C. § 605(e)(4), *see* Complaint at

¶¶ 18-19; 2) the basis for alleging assembly, manufacture and/or modification of devices

also in violation of 47 U.S.C. § 605(e)(4), *see* Complaint, Count IV at ¶¶ 44, 47; and 3) the

basis for alleging distribution of pirate access devices in violation of 47 U.S.C. § 605(e)(4),

*see* Complaint, Count III, at ¶¶ 21, 37, 40.

1.      **The "Atomic Multi-Purpose" Device is Designed "Primarily of Assistance" in Satellite Television Piracy.**

Based on thorough expert analysis of the functioning of an "Atomic Multi-Purpose" device, DIRECTV and its counsel reasonably concluded that the device met the statutory requirement that it be "*primarily* of assistance in the unauthorized decryption of…direct-to-home satellite services." *See* 47 U.S.C. § 605(e)(4)(italics added). It is important to note that section 605(e)(4) does not require that the **sole** purpose of the device be for piracy. *Id.* Rather, in its practical wisdom, Congress merely required that the device be "*primarily* of assistance" in piracy activity. *Id.*

As noted above, DIRECTV and its counsel relied on expert analysis of the device which indicated that an "Atomic Multi-Purpose" is designed primarily to circumvent DIRECTV's security measures and to pirate DIRECTV programming. *See* Barr Decl. at ¶¶ 5, 35. This expert analysis indicated that both the "unlooping" and "loading" functions of the device rely on "glitching" technology to modify certain generations of DIRECTV Access Cards in order to permit the piracy of DIRECTV's signal, that "glitching" has no legitimate purpose, except for use in products designed primarily for pirating DIRECTV satellite television signals. *Id.* at ¶¶ 20-21. Further, the expert analysis indicated that 80% of the chips used in an Atomic Multi-Purpose device were devoted to the "glitching" technology, and that this function comprised the lion's share of the cost of manufacture, and thus also the cost of owning the device. *Id.* at ¶¶ 22, 34.

Expert analysis also demonstrated that the two remaining electrical parts of the device involved in the "programming" function of the "Atomic Multi-Purpose" could also be used by pirates to circumvent DIRECTV's security measures. *Id.* at ¶ 14, & Ex. A, Schedule 2 at 14-15. The expert also found that the "programming" parts utilized were

included by manufacturers as a convenience to their pirate customers. *Id.* If a purchaser wished to obtain a standalone "programmer" these devices were readily available, at substantially lower prices on the same websites, and thus expert analysis concluded that it was extremely unlikely that a consumer would purchase an "Atomic Multi-Purpose" device by mistake. *Id.* at ¶ 34.    Thus, even assuming that there are other *theoretical* uses for the programming function of the Atomic Multi-Purpose, expert analysis concluded that the device was not designed for these purposes. *See id.* at ¶ 33. To the contrary, expert analysis concluded that the "programmer" portion of the "Atomic Multi-Purpose" device was primarily designed for the purpose of pirating DIRECTV's satellite television programming. *Id.*

Based on this thorough expert analysis, DIRECTV concluded that the primary design and function of the "Atomic Multi-Purpose" device, including the "unlooper," "loader," and "programmer" contained therein, was to circumvent DIRECTV's security measures and to assist in piracy, *see id.* at ¶¶ 5, 35, and thus, the device met the statutory requirements for DIRECTV's claims against defendant Patrick based on 47 U.S.C. § 605(e)(4).

## 2.  DIRECTV's Original Allegations of Modification and Distribution in Violation of 47 U.S.C. § 605(e)(4) are Well-Ground in Fact and Law.

Section 605(e)(4) of Title 47 states in pertinent, that it shall be a violation of the statute if any person:

> ...manufactures, assembles, modifies...or distributes any electronic, mechanical, or other device or equipment, knowing or having reason to know that the device or equipment is primarily of assistance in the unauthorized decryption of...direct-to-home satellite services, or is

> intended for any other activity prohibited by section (a) of
> this section....

47 U.S.C. § 605(e)(4).

Expert analysis of the "Atomic Multi-Purpose" device confirmed that all three of its functions, "unlooping," "loading," and "programming," can be used to modify DIRECTV Access Cards. *See* Barr Decl. at ¶¶ 23, 35. Each such modified DIRECTV Access Card could then in turn be used to unlawfully decrypt DIRECTV programming. *Id.* at ¶ 23. Thus, by using any of the functions of the "Atomic Multi-Purpose" device, one necessarily "modifies" a DIRECTV Access Card allowing its user to pirate DIRECTV satellite signals, thereby falling within the proscribed activity of § 605(e)(4) – prohibiting the "...modifi[cation]...[of] any electronic, mechanical, or other device or equipment, knowing or having reason to know that the device or equipment is primarily of assistance in the unauthorized decryption of...direct-to-home satellite services". *See* 47 U.S.C. § 605(e)(4).

Such modification of an Access Card through use of an "Atomic Multi-Purpose" device, even if done to obtain unauthorized interception of DIRECTV's signal for only one individual, is nonetheless a statutory violation of 47 U.S.C. § 605(e)(4). *See e.g. DIRECTV v. Hite,* Cause No. 3:03-CV-449 (E. Dist. Va.), Findings of Fact and Conclusions of Law, Feb. 13, 2004 (unpublished) (attached as Ex. A to McLaughlin Decl.). In *Hite,* the Court found that the defendant had purchased two devices: an unlooper (which utilizes "glitching" technology), and an emulator (which is another pirate access device specifically designed to permit the surreptitious interception of DIRECTV programming. *Id.* at 3. The *Hite* court noted that the "unlooper," like the "Atomic Multi-Purpose" device at issue here, "...is designed to restore functionality to illegally modified DIRECTV access cards that

were disabled by misuse or by DIRECTV's ECMs...." *Id.* at 3-4. The court, after a non-jury trial, first found that the defendant violated 47 U.S.C. § 605(a) by receiving DIRECTV's signals without authorization, and then went on to find that:

> Defendant...also violated the Federal Communications Act, 47 U.S.C. § 605(e)(4), by assembling or modifying devices, knowing or having reason to know that the devices were primarily used for the unauthorized decryption of DIRECTV's satellite transmissions of television programming....

*Id.* at 4.

However, in this case, because the "Atomic Multi-Purpose" device is **not** designed for a one-time use to illegally modify a single DIRECTV Access Card, DIRECTV and its counsel also alleged a separate claim for "distribution" under 47 U.S.C § 605(e)(4). Expert analysis of the "Atomic Multi-Purpose" device confirms that the "Atomic Multi-Purpose" device can be used to alter or "modify" **innumerable** DIRECTV Access Cards -- permitting each such modified card to enable its user to pirate DIRECTV programming. *See* Barr Decl. at ¶¶ 23, 35. Yet, for his own personal pirating activities, defendant Patrick would only need one such card. *See id.* at ¶ 23. Further, DIRECTV and its counsel were aware that, at the time of the defendant's purchase, a market existed for "modified" or "glitched" DIRECTV Access Cards, or for services to "repair" previously illegally modified cards that had been disabled by one of DIRECTV's ECMs. *See* Whalen Decl. at ¶¶ 3-4. Because a market existed at that time for these illegal cards, and because the device purchased by the defendant could be used to illegally modify a large number of Access Cards, far in excess of the defendant's personal needs for pirating activity, DIRECTV and

its counsel could reasonably infer from this evidence that defendant Patrick intended to distribute the excess in violation of 47 U.S.C. § 605(e)(4).[5]

Indeed, the type of circumstantial evidence that DIRECTV and its counsel relied upon to infer modification and distribution plays a recognized and crucial role in the litigation process. After all, "[c]ircumstantial evidence 'may be as persuasive and as compelling as testimonial evidence, and sometimes more so.'" *Lewis v. U.S.*, 942 F. Supp 1290, 1294 n. 5 (E.D. Cal. 1996)(quoting *Wigmore on Evidence*, § 26 at 961).

Specifically, claims of television piracy in violation of federal statutes, like those at issue here, have often been demonstrated through the use of circumstantial evidence. *See e.g. Cablevision v. Lokshin,* 980 F. Supp. 107, 114 (E.D.N.Y. 1997)(finding use of cable piracy device based on circumstantial evidence). Case law establishes that DIRECTV and its counsel are entitled to infer from the defendant's purchase of the "Atomic Multi-Purpose" that he used the device for its designed and intended purpose. In *Community Television Sys., Inc. v. Caruso,* 134 F. Supp. 2d 455, 460 (D. Conn. 2000), *aff'd,* 284 F.3d 430 (2d Cir. 2002), the Court held that purchase of an illegal satellite signal descrambling device created a reasonable inference that the device "was used for its intended purposes." *Id.* As the Court cogently stated in *DIRECTV v. Miller,* Cause No. 6:03-cv-1027-Orl-19KRS (M.D. Fla.) Order, dated November 20, 2003 (unpublished) (attached as Ex. B to McLaughlin Decl):

---

[5] A claim for "distribution" under 47 U.S.C. § 605(e)(4) does not require proof that that the distribution is commercial in nature, that the defendant received remuneration for the devices he distributed, or even that the defendant distributed more than one device. Courts have held that simply giving a single pirate access device to a relative constitutes "distribution" under the statute. *See DIRECTV v. Boonstra,* 302 F. Supp. 2d 822, 829-30 (W.D. Mich. 2004). Also, please take note that the *Boonstra* Court found distribution of the actual device in question, inferring distribution of the itself is not unreasonable.

> Based on their life experience, a jury could reasonably
> assume that people only buy equipment such as televisions,
> computers, or (in the case of Defendant) satellite piracy
> unloopers when they plan to use such equipment. It would
> be a strange world, after all, if people regularly bought such
> equipment and then put it in the closet to collect dust.

*Id.*

Thus, DIRECTV and its counsel were entitled to rely upon the defendant's purchase

of the device, as well as other evidence consistent with piracy activity such as the changes

in his account activity, to infer his use of the "Atomic Multi-Purpose" device for the

purposes for which it was designed -- the illegal modification of multiple DIRECTV

Access Cards for purposes of pirating DIRECTV's satellite signal. Because defendant

Patrick's use of the device would permit him to produce far more illegally modified

DIRECTV Access Cards than he would have required for his personal use, and because

DIRECTV was aware that a market existed at that time for such illegal cards, DIRECTV

and its counsel were further justified in relying on this circumstantial evidence to infer

distribution.

### C. In Deference to the Court's Concern, DIRECTV and its Counsel Have Filed an Amended Complaint Withdrawing Claims of Distribution and Modification under 47 U.S.C. § 605(e)(4).

Despite the fact that DIRECTV, and its counsel, believe that the pre-filing

investigation for the original Complaint was "reasonable under the circumstances," and that

its allegations and claims were well-ground in both fact and law, in an abundance of

caution, and in respectful deference to the concerns raised by this Court, counsel for

DIRECTV has filed an Amended Complaint removing all allegations of distribution and

claims for modification and distribution under 47 U.S.C. § 605(e)(4). *See McLaughlin*

Decl. at ¶ 24.[6]  Further, in deference to the Court's concern regarding the minimum amount

of $10,000 in damages under 47 U.S.C. § 605(e)(4), plaintiff's counsel has amended the

complaint to clearly allow the Court more discretion under the law in assessing damages in

this action.  The Amended Complaint now provides that in the event of default, DIRECTV

will seek only:

> ...an award of damages *up to $10,000* for violations of 47
> U.S.C. § 605(a), a further award of DIRECTV's reasonable
> attorneys' fees and costs in the amount of $850.00.

*See* Amended Complaint, Pray for Relief, ¶ 2, at 10.

Although the Rule provides no explicit "safe harbor" to a litigant responding to a

*sua sponte* order of the court to show cause under Fed. R. Civ. P. 11(c)(1)(B), the

comments of the Advisory Committee indicate that corrective action should be considered

in deciding what if any sanctions to impose:

> Since show cause orders will ordinarily be issued only in
> situations that are akin to a contempt of court, the rule does
> not provide a "safe harbor" to a litigant for withdrawing a
> claim, defense, etc., after a show cause order has been issued
> on the court's own initiative.  Such corrective action,
> however, should be taken into account in deciding what – if
> any – sanction to impose if, after consideration of the
> litigant's response, the court concludes that a violation has
> occurred.

*See* Advisory Committee Note to Fed. R. Civ. P. 11 (1993 Amendments).  In recognition of

the prophylactic corrective action that DIRECTV and its counsel took upon receipt of the

Court's September 17, 2004 Order in amending its complaint to remove the allegations and

claims of concern to the Court, DIRECTV and its counsel respectfully request that the

---

[6] Plaintiff's counsel has similarly amended complaints in two other similarly situated DIRECTV actions pending before this Court. *See* McLaughlin Decl. at ¶ 25.

DIRECTV's AND ITS COUNSEL'S REPSONSE
TO THE COURT'S ORDER TO SHOW CAUSE
REGARDING POSSIBLE FED. R. CIV. P 11
VIOLATIONS
NO. 03-12292-MLW – Page 19

Court find that none of the actions taken by DIRECTV or its counsel were akin to contempt, and thus that there has been no violation of Rule 11 or need to impose any sanctions.

## CONCLUSION

Based on the foregoing facts and authority, DIRECTV and its counsel respectfully request that the Court find that neither DIRECTV nor its counsel engaged in conduct akin to contempt, and that therefore, no violation of Rule 11 has occurred.

Respectfully Submitted for the Plaintiff,
DIRECTV, Inc.
By Its Attorney

10/21/04
Date

/s/ John M. McLaughlin
John M. McLaughlin
Green, Miles, Lipton & Fitz-Gibbon
P.O. Box 210
77 Pleasant Street
Telephone: (413) 586-0865
BBO No. 556328

## CERTIFICATE OF SERVICE

I, John M. McLaughlin, attorney for the Plaintiff, hereby certify that on the 21st day of October 2004, a copy of the foregoing DIRECTV'S and it's Counsel's Response to the Court's Order to Show Cause Regarding Possible FED. R. CIV. P 11 Violations, Affidavit of John M. McLaughlin, Affidavit of Michael Barr, Affidavit of Spencer Freeman, Affidavit of James Whalen, including all exhibits were sent via first-class mail to:

    Craig Patrick
    54 Holly Lane
    Holliston, MA  01746

                          /s/ John M. McLaughlin

                          John M. McLaughlin