UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS (Eastern Division)

| | |
|---|---|
| **DIRECTV, Inc.** ) | Case No.: **03cv12292 MLW** |
| ) | |
| Plaintiff, ) | |
| ) | **AFFIDAVIT OF JOHN M. McLAUGHLIN** |
| vs. ) | |
| ) | |
| **Craig Patrick** ) | |
| ) | |
| Defendant ) | |

Now comes the Affiant, and makes this his sworn statement, under the pains and penalties of perjury, of his own personal knowledge.

1. I, John M. McLaughlin, represent the Plaintiff in the above-entitled action.

2. I have been representing telecommunications plaintiffs in piracy actions since the late nineteen eighties. I have processed, literally thousands of piracy claims and I have brought hundreds of civil actions on behalf of this and other telecommunications plaintiffs.

3. I have never been found to have violated Rule 11. In fact, until this case, I have never even been the subject of a Rule 11 inquiry.

4. I honestly and truthfully believe I have a factual and legal basis for all of the claims that I originally brought in this action.

5. Prior to bringing the above referenced action, I made inquiries into the factual and legal basis upon which the action was brought.

6. I reviewed the purchase records evidencing the fact that this particular defendant purchased a device known as an "atomic multi purpose".

7. I had already reviewed materials provided to me by my client, materials based upon my client's expert's analysis of certain satellite piracy devices.

8. Based upon my client's expert's analysis, I was aware that the "atomic multi-purpose" device was a "Glitching" card repair device that also had programming capabilities.

9. While the "atomic multi purpose" had programming capabilities, I was aware that any individual interested only in programming (and not card repair) logically would have purchased a simple, less expensive, programmer. Accordingly, I was operating under the reasonable inference that by purchasing the "atomic multi purpose" the purchaser clearly was making that purchase for the "glitching" card repair capabilities of this device.

10. Through my past experience representing cable television companies for many years, the situation with the atomic multi purpose's programming capabilities and "glitching" card repair capabilities is somewhat similar to what I have seen with non-addressable cable television converter/descramblers (often called in hereinafter referred to as " black boxes"). Black boxes have the illicit, illegal capability of descrambling cable television signals, without the authorization of the cable television company. Many black boxes also have the ability to convert it's coaxial cable signals from the to the type of signal required by television sets (this conversion is a process now internalized in most "cable ready" televisions). This conversion capability is a benign, legal capability. Indeed, individuals interested only in converting signals and who did not have a "cable ready" television could buy a very inexpensive simple device called a "converter". Accordingly, in instances where I had evidence that an individual purchased a black box, the

logical inference I drew from that purchase was that the individual purchased a black box for its descrambling capabilities. An individual only interested in signal conversion programming (and not unauthorized descrambling) logically would have purchased a simple, less expensive, converter rather than purchase the much more expensive black box.

11. With the understanding of the black box scenario, I clearly understood that when the Defendant purchased the "atomic multi purpose" the logical inference to be drawn was that he was purchasing the device for its "glitching" card repair capabilities. If the defendant simply wanted a programmer he could have purchased a programmer.

12. From the information provided by my client's expert, I was familiar with the "glitching" and card repair capabilities of the atomic multi-purpose. Specifically, I understood that the atomic multi-purpose could "repair" previously illegally-modified access cards that had been caught in one of my client's electronic countermeasures. I knew that after a successful repair the repaired access card could go on to receive unauthorized interception of my client's signals.

13. Also, from the information provided by my client's expert, I knew that there was no legitimate use for the elements of the atomic multi-purpose that provided for the "glitching" and card repair capabilities.

14. Also, from the information provided by my client's expert, I knew that in order to "repair" a modified access card disabled by an electronic countermeasure, utilizing the Atomic-Multi-Purpose device, an individual

must actually re-manufacturer, modify and/or assemble the access cards in question.

15. The timing of the defendant's purchase of the device was also suspect. My client had very successful electronic countermeasures in early 2001. If an individual had been using a modified access card in early 2001 and that card had been disabled by one of my client's electronic countermeasures an individual would have had to purchase "glitching" technology soon after the illegal distributors started marketing such devices. Accordingly, this information and the Defendant's purchase of the Atomic Multi-purpose device in June of 2001 is an additional piece of evidence to support the inference of piracy.

16. Therefore, from the Defendant's purchase of the Atomic Multi-purpose device, I inferred that the device was used for piracy and that this defendant had been using a modified access card to obtain my client's signals without authorization *prior* to the purchase of the Atomic Multi-purpose device. A logical inference to be drawn from the purchase was that the Defendant needed the device to make repairs to cards that had been caught (disabled) in an electronic countermeasure.

17. In addition to expert information I received from my client, I also received the Defendant's account history prior to bringing the action against him. The fact that the Defendant had an account subscription, it is clear that this particular Defendant possessed the necessary legal equipment that would be used with

piracy devices to effectuate the unauthorized interception of my client's signals.

18. The account history was also extremely incriminating with inferences of piracy. The account evidenced a substantial period of time both prior to the purchase and thereafter where the defendant did not pay his bills and allowed the account to go into a "write off" status. This is totally consistent with the Defendant having been using a modified access card; having that access card disabled by electronic countermeasure; purchasing the Atomic Multi-purpose to repair disabled cards; repairing disabled cards and utilizing a repaired card to continue with unauthorized interception of signals.

19. Also, from the information provided by my client's expert, I knew that the Atomic Multi-purpose was not a single use device. It could repair innumerable cards that had been disabled by my client's electronic countermeasures.

20. Prior to bringing the action, I was also aware that a black market existed for the distribution of repaired cards. Additionally, individuals would offer their services to repair cards for third parties on a per request basis.

21. Please take note that the original Complaint in this action did not allege distribution for commercial gain; rather the allegation was gratuitous distribution.

22. After bringing the action against this Defendant, my office received two phone calls from the Defendant and thereafter received no correspondence or answers.

23. Also, after I brought the action against the Defendant, my client discovered that this Defendant had gone to a website where the users of the web site shared information and software to help each other to gain unauthorized interception to my client signals. The site was essentially a "how to" site.

24. After I received this Court's order regarding the Rule 11, I conferred with my client. Even though we believed we had acted in good faith in bringing all of the counts in the Complaint, in due respect to this Court's concerns, we decided to amend the Complaint to withdraw the manufacture and distribution counts and to amend the Complaint such that on default we would only move for a judgment seeking damages for violation of 47 U.S.C. § 605(a) "of *up to* $10,000")(emphasis added).

25. In addition, after I received this Court's order regarding the Rule 11, I reviewed other actions for the Plaintiff that were pending for default judgment before His Honor and were similarly situated to this civil action. After conferring with my client, on or about October 5, 2004, I made similar amendments in two other pending actions; DIRECTV vs. Desimone, Civil Action 1:03-cv-12295-MLW and DIRECTV vs. Annand, Civil Action 1:03-cv-12325-MLW.

26. Prior to bringing this action, I was aware that the language of the statutes and the numerous cases which supported my legal contentions, gave a legal basis for the counts I brought in conjunction with the factual elements referenced above. Certain cases that support my legal contentions are unpublished. Accordingly attached as exhibit A is a true and correct copy of *DIRECTV v.*

*Hite,* Cause No. 3:03-CV-449 (E. Dist. Va.), Findings of Fact and Conclusions of Law, Feb. 13, 2004 (unpublished); and attached as exhibit B is a true and correct copy of *DIRECTV v. Miller,* Cause No. 6:03-cv-1027-Orl-19KRS (M.D. Fla.) Order, dated November 20, 2003 (unpublished).

27. Again, I restate that I honestly believed that, after a diligent and sufficient investigation into this case and with good knowledge of the telecommunications case law, I had factual and legal basis and all of the counts in the Complaint. Also, no defendant and no other judge has ever put me on any type of Rule 11 notice of a problem with any of the counts in the Complaint or in similarly situated Complaints brought to this court. Therefore, I could not have been operating in any type of contempt of this Court's order or any other Court's order by bringing a Complaint in this manner.

28. In light of all of the above, I pray that this Court finds that my actions and the actions of my client, prior to bringing the Complaint and after receiving this Court order were sufficient such that no violation should be found or no sanctions should enter against me or my client.

10/21/04
Date

/s/ John M. McLaughlin
John M. McLaughlin
**Green, Miles, Lipton & Fitz-Gibbon**
P.O. Box 210
77 Pleasant Street
Telephone: (413) 586-0865
BBO No. 556328